**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SUSSEX FINANCIAL ENTERPRISES,      )  Case No. 08-4791 SC
INC.,                              )
                                   )  ORDER RE: CROSS-MOTIONS
            Plaintiff,             )  FOR SUMMARY JUDGMENT
                                   )
       v.                          )
                                   )
BAYERISCHE HYPO-UND VEREINSBANK    )
AG, a/k/a HYPOVEREINSBANK; HVB     )
RISK MANAGEMENT PRODUCTS, INC.;    )
HVB U.S. FINANCE, INC., f/k/a      )
HVB STRUCTURED FINANCE, INC.;      )
and DOES 1-100, inclusive,         )
                                   )
            Defendants.            )
_____)

I.  **INTRODUCTION**

     Plaintiff Sussex Financial Enterprises, Inc. ("Sussex")
brought this action against Defendants Bayerische Hypo-und
Vereinsbank AG, et al. (collectively, "HVB"), alleging fraud and
violation of the Racketeer Influenced and Corrupt Organizations Act
("RICO").  Second Amended Complaint, Docket No. 93 ("SAC").
Sussex has now filed a Motion for Partial Summary Judgment, Docket
Nos. 181 ("MPSJ"), 199 ("Opp'n to MPSJ"), 207 ("MPSJ Reply"), and
HVB has filed a Motion for Summary Judgment, Docket Nos. 187
("MSJ"), 195 ("Opp'n to MSJ"), 209 ("MSJ Reply").  Pursuant to
Civil Local Rule 7-1(b), the Court finds the motions suitable for

**United States District Court**
For the Northern District of California

1    determination without oral argument.  For the following reasons,

2    the Court DENIES Sussex's Motion for Partial Summary Judgment and

3    GRANTS HVB's Motion for Summary Judgment.

4

5    **II.   BACKGROUND**

6          **A.   Factual Background**

7          Sussex, formerly known as Chenery Associates, Inc.

8    ("Chenery"), is a San Francisco-based financial services company

9    owned by Roy E. Hahn ("Hahn") and his wife, Linda Montgomery.

10   Rossi Decl. I Ex. A ("Hahn Dep. I") at 22:21-23:21.[1]  From 1999 to

11   2001, Sussex offered financial services to a client base of "high-

12   net-worth individuals."  Id. at 27:2-30:2; Rossi Decl. I Ex. G

13   ("CARDS Presentation") at SUS_HVB034436.  Sussex was an early

14   provider of a financial product known as Custom Adjustable Rate

15   Debt Structure ("CARDS").  SAC ¶ 6.  While only HVB refers to CARDS

16   as a "tax shelter," see MSJ at 1, both parties agree that an

17   "intended and essential" element of CARDS was its ability to

18   generate sizable tax benefits for Sussex's clients.  SAC ¶ 9.  The

19   underlying CARDS structure developed from conversations Hahn had

20   with Raymond J. Ruble ("Ruble"), who was then a tax lawyer and

21   partner in the New York office of Sidney Austin Brown & Wood LLP

22   ("Sidley Austin").  Hahn Dep. I at 15:5-17:2.

23         In 1998 and 1999, Sussex marketed CARDS to high-income U.S.

24   investors -- in particular, "dot-com millionaires" who had acquired

25

26   [1] Ronald R. Rossi ("Rossi"), counsel for HVB, filed two
     declarations relevant to this Order.  The first is a Declaration in
27   support of HVB's MSJ.  Docket No. 188 ("Rossi Decl. I").  The
     second is a Declaration in support of HVB's Motion to Strike the
28   Expert Report and Testimony of Lynn Boak.  Docket No. 191 ("Rossi
     Decl. II").

**United States District Court**
For the Northern District of California

1   valuable stock in firms but were cash-poor due to their inability

2   to sell the stock.  Hahn Dep. I at 16:19-17:10.  Sussex cited in

3   its promotional materials a "favorable tax opinion by a major New

4   York law firm" stating that the Internal Revenue Service ("IRS")

5   would "more likely than not" find the tax benefits possible through

6   CARDS to be legal.  CARDS Presentation at SUS_HVB034422, 034440.

7   The favorable tax opinion was written by Ruble, the co-developer of

8   CARDS, on behalf of his law firm.  Hahn Dep. I at 204:18-24.   This

9   letter, according to Sussex, would protect clients from having to

10  pay a "substantial understatement penalty" if the IRS ultimately

11  found CARDS to be an illegal tax shelter.  CARDS Presentation at

12  SUS_HVB034422, 034440.

13      The underlying structure of CARDS is complex.  Each

14  transaction required Sussex to identify three participants and,

15  through a series of steps, "negotiate them toward a closing."  Hahn

16  Dep. I at 26:15-20.  Those three participants were a borrower, a

17  lender, and an "assuming party."  Id. at 18:21-19:23.

18      First, Sussex would cover the incorporation costs and

19  attorney's fees necessary to establish a "single-purpose" limited

20  liability company ("LLC"), which would serve as the borrower.  Id.

21  at 19:2-4, 80:4-7, 82:5-13.  In all but two instances, the members

22  of these LLCs were two British nationals.  Id. at 76:21-79:24.  The

23  foreign nationality of the LLC members was critical to CARDS,

24  because CARDS' tax benefits were not possible without the members'

25  tax-neutral status as "nonresident aliens."  Rossi Decl. I Exs. L

26  ("DeGiorgio Dep.") at 223:5-224:18, H ("Boak Dep.") at 77:3-14.

27      Sussex would then arrange for this LLC to borrow funds from a

28  lender, usually in a foreign currency.  Cards Presentation at

**United States District Court**
For the Northern District of California

SUS_HVB034425.  A specific Credit Agreement set the terms of this loan, and a "Master Pledge and Security Agreement" incorporated into the Credit Agreement required the borrower to pledge back the loan proceeds to the lender as collateral for the loan.  Boak Dep. at 78:17-20; Rossi Decl. Ex. F ("Credit Agreement") §§ 4.01(f), (g).  Because the loan proceeds would be deposited with the lender as collateral for the loan, no money left the lender, and thus the lender's actual exposure to risk was minimal.  Boak Dep. at 77:24-78-19.  Because of this, both parties have characterized CARDS as a "zero-risk" loan for the lender.  Boak Dep. 77:12-14; Rossi Decl. I Ex. O ("DeGiorgio/Hahn E-mail"), Hahn Decl. I ¶ 7.[2]  The terms in the Credit Agreements governing each transaction were substantially similar.  Hahn Dep. I at 43:8-44:8, 45:11-51:23.  Both lender and borrower could transfer their rights and obligations under the agreement to another party.  The borrower could do so with approval of the lender.  Credit Agreement § 10.04.  The lender could transfer its interest to a replacement lender without consulting the borrower.  Id. § 2.06.

Next, one of Sussex's clients ("the client") would become the "assuming party" by entering into an assumption agreement with the LLC.  In exchange for agreeing to become jointly and severally liable on the loan with the LLC, the client would receive a portion of the loan (usually, around fifteen percent).  CARDS Presentation at SUS_HVB034421-034431.  To assure the loan was fully collateralized, the client would be required to either deposit this

---

[2] Roy E. Hahn ("Hahn") filed two Declarations relevant to this Order.  The first was filed in support of Sussex's MPSJ.  Docket No. 184 ("Hahn Decl. I").  The second was filed in support of Sussex's Opposition to Defendant's MSJ.  Docket No. 197 ("Hahn Decl. II").

**United States District Court**
For the Northern District of California

percentage of the loan proceeds with the lender or pledge illiquid assets as collateral. Boak Dep. at 79:20-80:8. While the deposit held in collateral with the bank would generate a return, this return was less than the overall interest rate on the loan, leading to a "negative carry" necessitating the borrowers to make periodic interest payments. Boak Dep. 129:2-15. Under the standard Assumption Agreement, the LLC would be responsible for payments of interest and the client would be responsible for payments of principal on the loan. Cards Presentation at SUS_HVB034423.

The clients paid significant fees to participate in CARDS -- usually four to seven percent in loan origination fees, in addition to the ongoing interest payments on the loan. Rossi Decl. I Ex. B ("Hahn Dep. II") at 103:8-13. The benefit the clients received in return was a significant tax loss. CARDS Presentation at SUS_HVB034430. Because the client's tax base was one hundred percent of the loan, the sale of the fifteen percent deposit would result in an ordinary loss amounting to eighty-five percent of the loan. Id. As a consequence, the claimed tax loss was considerably higher than the out-of-pocket costs for participating in CARDS. Id. The client had an opportunity to prepay the loan every year, essentially ending the CARDS transaction. Id. at 034435.

The LLC members received a fee for participating in the transaction, typically 0.5% of the total loan amount. Hahn Dep. I at 80:8-21. The lenders received a 1.0% loan origination fee, as well as interest payments. Id. at 249:25-255:7; DeGiorgio Dep. at 174:9-16. Sussex also paid a "licensing fee" for each CARDS transaction initiated to a trust controlled by Ruble, the author of the "favorable tax opinion," for a combined total of nearly $2

United States District Court
For the Northern District of California

million.  Hahn Dep. I at 94:15-19, 203:2-24.  Sussex did not tell its clients that the author of the tax opinion received a fee for each CARDS transaction.  Id. at 98:5-13.  Sussex collected more than $60 million from its CARDS clients.  Hahn Dep. II at 103:8-13; Hahn Dep. I at 260:21-261:1; Rossi Decl. I Ex. C ("Plaintiff's CARDS Fees").

HVB is a German financial institution and bank that operates in the United States through an office in New York, New York.  SAC ¶ 4.  Around October 2000, Hahn was introduced to Dom DeGiorgio ("DeGiorgio"), senior vice-president of HVB's subsidiary, HVB Structured Finance Inc.  Hahn Dep. I at 31:5-33:2; Docket No. 46 Ex. A ¶ 3.  After a series of meetings, phone calls, and e-mail exchanges between Hahn and DeGiorgio, HVB agreed to participate as a CARDS lender, consummating twenty CARDS transactions by the end of 2000.  Hahn Dep. I at 41:3-5, 41:19-23.  HVB ultimately participated in twenty-nine CARDS transactions as a lender, and was the fourth of five banks to participate in CARDS.  SAC ¶ 6; Hahn Dep. I at 20:7-21; 44:9-19.  The provisions of the Credit Agreements used with HVB were substantially similar to the agreements Sussex had used with other banks in CARDS transactions. Hahn Dep. I at 45:11-51:23.  As with earlier CARDS transactions, the loan had to be affirmatively renewed by the bank once each year.  Credit Agreement § 2.04(g).

Around October 2001, DeGiorgio told Hahn that HVB would not be renewing its existing CARDS loans when the current interest period concluded.  Hahn Dep. I at 215:22-216:6.  DeGiorgio claimed that the reason was market uncertainty following the September 11, 2001 attacks, as well as HVB's inability to replace a key employee who

United States District Court
For the Northern District of California

1   had left HVB and had been in charge of the loans.  SAC ¶ 20.

2        In March 2002, the IRS issued a report identifying the

3   underlying structure of CARDS as a "listed transaction."  Rossi

4   Decl. I Ex. R ("IRS Notice 2001-21").  A "listed transaction" is a

5   "transaction [that] is the same or substantially similar to one of

6   the types of transactions that the [IRS] has determined to be a tax

7   avoidance transaction and identified by notice, regulation, or

8   other form of published guidance as a listed transaction."  26

9   C.F.R. § 301.6111-2.  In doing so, the IRS made public its position

10  that CARDS was a fraudulent tax shelter and its intention to

11  challenge CARDS in court.  IRS Notice 2002-21.  The rationale the

12  IRS provided for this announcement was that the losses claimed in a

13  CARDS transaction were inflated due to "a basis in excess of the

14  fair market value of the Conveyed Assets."  Id.  In 2004, the IRS

15  published a Coordinated Issue Paper specifically identifying CARDS

16  as the transaction at issue in IRS Notice 2002-21 and providing

17  several grounds for its position that CARDS-generated tax losses

18  were illegal.  Rossi Decl. I Ex. E ("IRS Coordinated Issue Paper").

19       Six of Sussex's clients ultimately sued Sussex for claims

20  arising from their purchase of CARDS transactions.  Hahn Decl. II

21  ¶ 2.  Sussex claims it has spent $377,100 defending these lawsuits.

22  Id. Ex. 7 ("Pl.'s Attorney Invoices").  In several of these

23  lawsuits, both Sussex and HVB were named as defendants.  E.g., Hahn

24  Decl. II Ex. 8 ("RLP Holdings Compl."), 9 ("Kerman Compl.").  In at

25  least one action, HVB was sued by the client of another CARDS

26  marketer for its involvement in CARDS.  See Rezner v. Bayerische

27  Hypo-Und Vereinsbank AG, No. 06-2064 (N.D. Cal. May 1, 2009).

28  Sussex was not a party to Rezner.

7

**United States District Court**
For the Northern District of California

In February 2006, HVB entered into a Deferred Prosecution Agreement with the U.S. Department of Justice.  SAC ¶¶ 17, 23; Docket No. 46, Ex. A ("DPA").  In the DPA and its accompanying Statement of Admitted Facts, HVB admitted to the following:

- o HVB assisted "high net worth United States citizens" evade income taxes by "participating in and implementing fraudulent tax shelter transactions, including  . . . CARDS."  DPA ¶ 2.

- o While CARDS involved "loans with a purported 30-year term," HVB never intended to renew the loans after the first year, and "the transactions would be unwound in approximately one year in order to generate the phony tax benefits sought by the client participants."  Id. ¶ 19.

- o HVB engaged in the unlawful and fraudulent conduct of "preparing and signing false and fraudulent factual recitations, representations, and documents as part of the documentation underlying the shelters."  Id. ¶ 2.

- o HVB and DeGiorgio made false representations "that the transactions were being entered for legitimate business purposes and that the material terms of the loan agreements had been negotiated at arms length."  Id. ¶ 19.

- o HVB knew that the LLCs "were merely nominees who had no legitimate business purpose in entering the transaction and who were simply being paid to lend their neutral U.S. tax status to the transaction in order to enable the U.S. client to obtain their claimed tax benefits."  Id. ¶ 20.

- o DeGiorgio "improperly manipulated HVB demand deposit

**United States District Court**
For the Northern District of California

accounts, through which various payments related to these transactions were run." Id. ¶ 22. As part of the DPA, HVB agreed to pay the U.S. government more than $29 million in fees and penalties. Id. ¶ 3.

While HVB admitted the above in the DPA, HVB also alleged that the CARDS "clients/'borrowers'" -- ostensibly, Sussex and/or its clients -- were complicit in the scheme. Specifically, HVB claimed "all parties" knew the CARDS transactions would be unwound within one year, that clients/borrowers misrepresented CARDS as an "arms length" transaction for legitimate business purposes, and that all parties knew the LLCs had "no legitimate business purpose in entering the transaction and . . . were simply being paid to lend their neutral U.S. tax status to the transaction in order to enable the U.S. client to obtain their claimed tax benefits." Id. ¶¶ 19, 12, 20.

**B.   Procedural Background**

In its SAC, Sussex brings three causes of action. First, Sussex claims that HVB committed fraud in the negotiations between Sussex and HVB in late 2000. SAC ¶¶ 11, 36-39 ("Sussex's First Fraud Claim"). Sussex claims that it intended the loans to be long-term, thirty-year loans, and that it had no intention to unwind the CARDS transactions after one year. SAC ¶ 7. Sussex claims that HVB's commitment to renewing the loans for thirty years was critical to the Sussex's clients receiving a legitimate tax benefit. Id. ¶¶ 36-39. Sussex claims that HVB committed fraud by misrepresenting to Sussex in the CARDS negotiations that it intended to renew the loans for the full thirty years, and that Sussex never would have entered into an agreement with HVB had it

United States District Court
For the Northern District of California

1   known HVB planned to call the loans after a year.   Id.   Sussex

2   argues that, as a consequence of HVB's misrepresentations, it paid

3   HVB loan origination fees and was sued by its clients.   Id.

4        Second, Sussex alleges that HVB committed fraud by

5   representing to Sussex that it would "set up and fund the loans in

6   individual accounts in a timely manner," when HVB had no intent to

7   do so.   Id. ¶¶ 30-35 ("Sussex's Second Fraud Claim").   Sussex also

8   claims that this caused Sussex to be injured in the form of loan

9   origination fees paid to HVB and lawsuits brought by Sussex's

10  clients.   Id.

11       Third, Sussex brings a RICO action against HVB for its

12  "promotion and participation in the CARDS program."   Id. ¶¶ 40-45.

13  Sussex claims that as a result of HVB's conduct, it suffered

14  damages in the form of the loan origination fees it paid to HVB and

15  in the cost of defending itself in lawsuits brought by its clients.

16  Id. ¶¶ 28-29, 34.

17       HVB filed two Motions to Dismiss.   Docket Nos. 49 ("First

18  MTD"), 105 ("Second MTD").   The Court granted HVB's First Motion to

19  Dismiss, giving Sussex leave to file an amended complaint.   Docket

20  No. 66 ("First MTD Order").   The Court denied HVB's Second Motion

21  to Dismiss, finding that Sussex's causes of action were pleaded

22  with the requisite level of particularity.   Docket No. 147 ("Second

23  MTD Order").   The Court noted that many of the arguments made by

24  HVB in its Second Motion to Dismiss were "better suited for summary

25  judgment, or that failing, for trial before an appropriate fact

26  finder."   Id. at 6-7.

27       HVB filed two motions to strike in response to Sussex's MPSJ.

28  HVB's Motion to Strike the Expert Testimony of Lynn Boak is now

United States District Court
For the Northern District of California

1   fully briefed.  Docket Nos. 190 ("First MTS"), 193 ("First MTS

2   Opp'n"), 211 ("First MTS Reply").  HVB also filed a Motion to

3   Strike all or part of three documents filed in support of Sussex's

4   Opposition to HVB's MSJ: (1) Paragraphs 2, 11-14 and 17 of the

5   first Hahn Declaration, (2) the entire affidavit of Ronald E.

6   Braley ("Braley"), Brady Decl. II Ex. A ("Braley Aff."), and (3)

7   paragraph 7 of the affidavit of Philip G. Groves ("Groves"), Brady

8   Decl. II Ex. B ("Groves Aff.").  Docket No. 201 ("Second MTS").[3]

9   This motion is also fully briefed.  Docket Nos. 214 ("Opp'n to

10  Second MTS"), 218 ("Reply to Second MTS").

11

12  **III.  LEGAL STANDARD**

13      Summary judgment under Rule 56(c) of the Federal Rules of

14  Civil Procedure may be granted where the pleadings and materials on

15  file show "that there is no genuine issue as to any material fact

16  and that the moving party is entitled to judgment as a matter of

17  law."  A moving party that will have the burden of proof on an

18  issue at trial must "affirmatively demonstrate that no reasonable

19  trier of fact could find other than for the moving party."

20  Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir.

21  2007).  Where the nonmoving party will have the burden of proof at

22  trial, the moving party "can prevail merely by pointing out that

23  there is an absence of evidence to support the nonmoving party's

24  case."  Id.  If the moving party fails to persuade the court that

25  there is no genuine issue of material fact, then "the nonmoving

---

26  [3] Stephen Brady ("Brady"), counsel for Sussex, has filed two
27  Declarations relevant to this Order. One was filed in support of
    Sussex's MPSJ.  Docket No. 183 ("Brady Decl. I").  The second was
28  filed in Opposition to HVB's MSJ.  Docket No. 196 ("Brady Decl.
    II").

11

party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000).  However, if the moving party meets its initial burden, then the burden shifts to the nonmoving party to produce evidence supporting its claims or defenses.  Id.

When evaluating a motion for partial or full summary judgment, the court views the evidence through the prism of the evidentiary standard of proof that would pertain at trial.  Anderson v. Liberty Lobby Inc., 477 U.S. 242, 255 (1986). The court draws all reasonable inferences in favor of the non-moving party.  See, e.g., Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 520 (1992).  The court determines whether the non-moving party's "specific facts," coupled with disputed background or contextual facts, are such that a reasonable jury might return a verdict for the non-moving party. T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 631 (9th Cir. 1987).  In such a case, summary judgment is inappropriate.  Anderson, 477 U.S. at 248.  However, where a rational trier of fact could not find for the nonmoving party based on the record as a whole, there is no "genuine issue for trial."  Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 587 (1986).

## IV.  Discussion

In its MPSJ, Sussex seeks partial summary judgment in its favor on its RICO claim.  MPSJ at 1.  Sussex notes that a RICO case was adjudicated against HVB in Rezner, No. 06-2064 (N.D. Cal. May 1, 2009).  In that case, a CARDS client brought a RICO action

against HVB.  Id.  Basing judgment largely on the admissions HVB made in its DPA, the court granted partial summary judgment on the plaintiff's RICO claim, finding no disputed issues of material fact as to whether HVB conducted an enterprise through a pattern of racketeering activity.  Id. at 12.  HVB and Rezner ultimately entered into a stipulated final judgment.  No. 06-2064 (N.D. Cal. June 16, 2009).  Sussex argues HVB should be collaterally estopped from re-litigating its RICO defense, and argues that even if collateral estoppel does not apply, there are no disputed issues of material fact as to HVB's RICO liability, given HVB's DPA admissions.  MPSJ at 1.

In its MSJ, HVB makes several arguments for judgment in its favor, including some that it made earlier in its motions to dismiss.  First, HVB argues that Sussex cannot, as a matter of law, prove that it justifiably relied on HVB's alleged promise to renew the loans for thirty years, because HVB's alleged statements are inadmissible under the parol evidence rule and because they contradict the terms of the Credit Agreement.  MSJ at 12.  HVB argues that the Credit Agreement is an integrated written agreement that unambiguously gave HVB the right not to renew the loans after the first year, and that Sussex cannot justifiably rely on oral promises outside an integrated written agreement.  Id.

Second, HVB argues that the injuries Sussex alleges are either barred by law or unsupported by any evidence.  Id. at 16-19.  Specifically, HVB argues that the loan origination fees paid by Sussex to HVB are not a legally permissible injury, and that Sussex has failed to submit evidence creating a causal link between HVB's conduct and Sussex being sued by its clients.  HVB further argues

United States District Court
For the Northern District of California

13

**United States District Court**
For the Northern District of California

1   that the evidence shows Sussex was not damaged by HVB's

2   participation in CARDS, but rather enriched, because the $14.8

3   million that Sussex collected from its clients on HVB-funded CARDS

4   transactions is greater than Sussex's alleged injuries.  Id. at 20-

5   21.  Sussex makes a number of other arguments in favor of summary

6   judgment, but because the Court finds the two above to be

7   dispositive, it does not discuss them here.

8          **A.    <u>Evidentiary Objections</u>**

9                1.   <u>Sussex's Evidentiary Objections</u>

10      Sussex did not file objections to HVB's MSJ or raise

11  objections in its Opposition to HVB's MSJ.  However, Sussex did

12  object to exhibits attached to HVB's First Motion to Strike.

13  Docket No. 198 ("Def.'s Objs. to First MTS").  Because HVB cites to

14  two of these exhibits in its MSJ, <u>see</u> Rossi Decl. I Exs. T & U, the

15  Court will rule on these objections.

16      Sussex objects to a press release purportedly issued by the

17  United States Attorney in the Southern District of New York as

18  inadmissible under Federal Rules of Evidence 801 and 901.  Id. at

19  2.  In this document, attached to both HVB's First Motion to Strike

20  and MSJ, the U.S. Attorney states its decision not to prosecute

21  Sidley Austin for its involvement in CARDS, and discusses Ruble's

22  participation in CARDS, stating that he issued "fraudulent cookie-

23  cutter opinion letters".  <u>See</u> Rossi Decl. II Ex. Q ("U.S. Attorney

24  Press Release").  Because the press release is issued by a

25  government authority, it is self-authenticating under Federal Rule

26  of Evidence 902(1).  <u>U.S. ex rel. Parikh v. Premera Blue Cross</u>, No.

27  01-0476, 2006 WL 2841998, *8 (W.D. Wash. Sept. 29, 2006).  However,

28  this document cannot be used to prove the truth of the matter

**United States District Court**
For the Northern District of California

1  asserted -- that Ruble acted fraudulently -- without violating Rule

2  801.  As such, this objection is SUSTAINED.

3       Second, Sussex objects to a statement issued by Sidley Austin

4  about its involvement in CARDS, claiming it violates Rules 801 and

5  901.  See Rossi Decl. II Ex. R ("Sidley Austin Statement").  HVB

6  argues that the Sidley Austin Statement was annexed to the U.S.

7  Attorney Press Release, and is thus admissible under Rule 902(1).

8  Reply to Second MTS at 14-15.  The Court finds that Rule 902(1)

9  does not apply because it is not issued by a government authority,

10 and SUSTAINS Sussex's objection.

11           2.   HVB's Evidentiary Objections

12      HVB makes numerous evidentiary objections in its two motions

13 to strike.  First, HVB moves to strike the Braley Affidavit, which

14 Sussex attached to its Opposition to HVB's MSJ.  See Second MTS.

15 In his affidavit, Braley identifies himself as an attorney who was

16 retained from 1999-2001 by several of the CARDS clients "to advise

17 on the benefits and risks" of CARDS transactions.  Braley Aff. ¶ 3.

18 HVB argues that Sussex failed to disclose Braley as a potentially

19 knowledgeable person as required by Federal Rule of Civil Procedure

20 26, and thus Braley should be barred from testifying under Rule

21 37(c)(1).  Second MTS at 1, 6.  Sussex did not formally disclose

22 Braley until it served HVB with a supplemental Rule 26 disclosure

23 on June 8, 2010 -- four days after it filed its Opposition to HVB's

24 MSJ.  See Katz Decl. II, Ex. 2.[4]  Sussex claims Rule 26 does not

25

26 [4] Richard L. Katz ("Katz"), counsel for Sussex, has filed two
   Declarations relevant to this Order.  The first was filed in
27 support of Sussex's Opposition to HVB's Motion to Shorten Time.
   Docket No. 206 ("Katz Decl. I").  The second was filed in support of
28 Sussex's Opposition to HVB's Second MTS.  Docket No. 215 ("Katz
   Decl. II").

United States District Court
For the Northern District of California

apply because Braley was not considered a potential witness to support its claims at the time of Sussex's Rule 26 disclosures. Opp'n to Second MTS at 2.  Counsel for Sussex states: "It was only after speaking with Mr. Braley approximately one week before filing Plaintiff's MSJ did it become apparent Mr. Braley had valuable information that could be used at trial."  Katz Decl. I ¶ 8.

Sussex filed its Motion for Partial Summary Judgment Motion on May 14, 2010, see MPSJ, and so, by Katz's declaration, Sussex learned of Braley's relevance to the case around May 7, 2010.  HVB points out that the Braley Affidavit is dated April 1, 2010. Second MTS Reply at 2; see Braley Aff.  Plaintiff has not argued that the date on the Braley Affidavit is incorrect.

Under Rule 37 of the Federal Rules of Civil Procedure, a party that fails to identify a witness as required by Rule 26(a) or 26(e) may not use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.  The Court finds Sussex's failure to disclose is not substantially justified or harmless. Even if there is an innocent explanation for the discrepancy between the April 1 date on the Braley affidavit and the date given by Katz, by failing to disclose Braley, HVB was denied the opportunity to depose Braley in preparing its MSJ and its response to Sussex's MPSJ.  The Court hereby GRANTS HVB's Motion to Strike the Braley Affidavit.

Second, HVB argues that the Hahn and Groves Affidavits should be excluded under the parol evidence rule, because they were "submitted in an impermissible attempt to alter the terms of a written contract."  Second MTS at 2-3.  Because California's parol

evidence rule is a rule of substantive law, and because this issue is tightly wound with the substantive arguments made in HVB's MSJ, this issue is addressed <u>infra</u> in Part IV.B.

Finally, HVB objects to the Hahn Affidavit and to the expert report and testimony of Boak as impermissible expert testimony under Rule 702 of the Federal Rules of Evidence. <u>See</u> First MTS at 1, Second MTS at 1-2.  While the Court recognizes that this evidence is vulnerable to this objection, it declines to rule on it, because even when the evidence is considered by this Court, HVB is still entitled to summary judgment. <u>See</u> <u>Smith v. County of Humboldt</u>, 240 F. Supp. 2d 1109, 1115-16 (N.D. Cal. 2003).

## B.   <u>Sussex's MPSJ</u>

Sussex seeks partial summary judgment on its RICO claim.  The four elements of a RICO violation are: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. <u>Jarvis v. Regan</u>, 833 F.2d 149, 151 (9th Cir. 1987).  In addition, a private plaintiff must prove it suffered an injury caused by the defendant's RICO violation.  <u>Avalos v. Baca</u>, 596 F.3d 583, 592 (9th Cir. 2010).  Sussex argues that HVB should be collaterally estopped from raising a RICO defense, because a final judgment on a RICO cause of action was entered against HVB for its involvement in CARDS in <u>Rezner v. Bayerische Hypo-Und Vereinsbank AG</u>, No. 06-2064 (N.D. Cal. May 9, 2009).  MPSJ at 5.  Sussex argues that even if collateral estoppel does not apply, there are no material issues of disputed fact, given HVB's admissions in its DPA.  <u>Id.</u> at 7-16.

Collateral estoppel prevents a party from relitigating an issue decided in a previous action if four requirements are met: "(1) there was a full and fair opportunity to litigate the issue in

United States District Court
For the Northern District of California

the previous action; (2) the issue was actually litigated in that action; (3) the issue was lost as a result of a final judgment in that action; and (4) the person against whom collateral estoppel is asserted in the present action was a party or in privity with a party in the previous action." Kendall v. Visa U.S.A., Inc., 518 F.3d 1042, 1050 (9th Cir. 2008) (citation omitted).  HVB argues that collateral estoppel should not apply because RICO "is not some undifferentiated 'issue'," but rather "a cause of action with multiple legal elements, each of which requires proof of numerous independent factual predicates."  Opp'n to MPSJ at 12.

The Court agrees with HVB.  There are multiple factual differences between the RICO claim judged against HVB in Rezner and the RICO claim Sussex brings in the present action, notably RICO's enterprise requirement.  In Rezner, the court did not actually identify in its order the members of the RICO enterprise, and its discussion of the "common purpose" requirement suggests the enterprise consisted of HVB, Sidley Austin, and Chenery.  Rezner at 8.  Additionally, in its analysis of the existence of an "ongoing organization," the court identified that the predicate crimes were committed by an "associated-in-fact organization involving [HVB], Chenery, Sidley Austin, and others."  Id. at 9.  A co-conspirator may not sue a member of the same conspiracy for violation of RICO. See Lopez v. Dean Witter Reynolds, Inc., 591 F. Supp. 581, 588 n.4 (N.D. Cal. 1984).  Because Rezner leads to a dispute of material fact over whether HVB and Sussex were co-conspirators, it does not justify partial summary judgment in Sussex's favor.  For the above reasons, the Court holds that Sussex's collateral estoppel argument fails.

18

**United States District Court**
For the Northern District of California

Similarly, Sussex's argument that HVB's DPA admissions leave no dispute of material fact on its RICO claim also fails, for the reasons raised in HVB's MSJ, which the Court will now discuss.

### C.   HVB's Parol Evidence and Reasonable Reliance Arguments

In its First Fraud Claim, Sussex alleges HVB never had the intent to renew the CARDS loans after the first year, and that HVB fraudulently misrepresented this intent in the CARDS credit agreement negotiations.  SAC ¶¶ 36-39.[5]   In California, the elements of fraud are: (a) a misrepresentation by the defendant to the plaintiff; (b) the defendant's knowledge of its falsity; (c) the defendant's intent to defraud; (d) the plaintiff's justifiable reliance; and (e) the plaintiff's resulting damage.  Lazar v. Super. Ct., 12 Cal. 4th 631, 638 (1996).  While statements relating to what may happen in the future are generally not actionable, a promise made without any intention to perform may constitute a misrepresentation.  Cal. Civ. Code § 1710; Lazar, 12 Cal. 4th at 638.  Such an action is often referred to as "promissory fraud." Id.  HVB's alleged misrepresentation of its intent to renew the loans for the full thirty years is a misrepresentation of the "promissory fraud" variety.

HVB's first argument in favor of summary judgment on Sussex's First Fraud Claim and RICO claim is that Sussex's proffered evidence cannot, as a matter of law, establish that Sussex justifiably relied on HVB's alleged promise to renew the loans for

---

[5] While the parties entered into twenty-nine CARDS transactions and each transaction was governed by a separate Credit Agreement, the parties agree that they contained substantially the same terms. SAC ¶ 6; Hahn Dep. I 45:11-51:23.  Thus, for simplicity's sake, the Court will refer to the agreements collectively as "Credit Agreement."

**United States District Court**
For the Northern District of California

1   thirty years, because it is inadmissible under the parol evidence

2   rule and because it contradicts the terms of the Credit Agreement.

3   MSJ at 12.   HVB argues that the Credit Agreement clearly and

4   unambiguously gave the lender the unqualified right to demand

5   prepayment of the loan after one year, and thus Sussex's First

6   Fraud Claim is barred by the parol evidence rule.   Id. at 13.   HVB

7   argues that as a consequence, Sussex cannot show that HVB made a

8   misrepresentation or that Sussex justifiably relied on such a

9   misrepresentation, and thus Sussex's First Fraud claim must fail.

10  Id.   HVB also argues that as a consequence, this alleged

11  misrepresentation cannot serve as the predicate act for Sussex's

12  RICO claim, and so any RICO claim based on this action should fail.

13  Id.

14       Federal courts deciding state-law causes of action must apply

15  the same parol evidence rule that the forum state would use.   Jinro

16  America Inc. v. Secure Invest., Inc., 266 F.3d 993, 998-99 (9th

17  Cir. 2001).   California's parol evidence rule prohibits a party

18  from using extrinsic evidence of a prior or contemporaneous oral

19  agreement to contradict a plain and unambiguous term of a fully

20  integrated agreement.   Cal. Code Civ. Proc. § 1856(a).   This rule

21  applies not only to breach-of-contract claims, but also to other

22  causes of action, including fraud.   Charnay v. Cobert, 145 Cal.

23  App. 4th 170, 186 (Ct. App. 2006).[6]

24       Because the parol evidence rule only applies to integrated

25

---

26  [6]   While California's parol evidence rule contains a "fraud
    exception," Cal. Civ. Proc. Code § 1856(g), this exception does not
27  extend to "promissory fraud claims premised on prior or
    contemporaneous statements at variance with the terms of a written
28  integrated agreement."   Casa Herrera, Inc. v. Beydoun, 32 Cal. 4th
    336, 346 (2004) (citations omitted).

**United States District Court**
For the Northern District of California

written agreements, Cal. Code Civ. Proc. § 1856(a), the Court must determine, as a threshold matter, whether each Credit Agreement was intended to be a complete and final expression of the parties' agreement. Masterson v. Sine, 68 Cal. 2d 222, 225 (1968). The presence of an integration clause is conclusive on the issue of integration. Salyer Grain & Milling Co. v. Hensen, 13 Cal. App. 3d 493, 501, (Ct. App. 1970). The Credit Agreement includes an integration clause. See Credit Agreement § 10.19. The Court also finds it to be an exhaustive 41-page document that addresses every material aspect of the agreement between the lender and the borrower, including the effective dates, names of the parties, and the obligations for both borrower and lender. Therefore, the Court finds that the Credit Agreement is a fully integrated agreement.

In California, there are two steps to determining whether to admit parol evidence to aid in interpreting an integrated agreement. Pac. State Bank v. Greene, 110 Cal. App. 4th 375, 386 (Ct. App. 2003). First, the court provisionally receives -- without actually admitting -- all credible evidence concerning whether the language is "reasonably susceptible" to the interpretation urged by a party. Id. If the court decides in light of this evidence that the language is reasonably susceptible to the interpretation urged, it proceeds to the second step, interpreting the language in light of the parol evidence to resolve this latent ambiguity. Id.

The Court first finds that there is no facial ambiguity in the Credit Agreement as to HVB's right to withdraw from CARDS after one year. When read as a whole, the Credit Agreement unambiguously gives HVB sole discretion to withdraw from the funding of the CARDS

loans after a year.   Section 2.04(d) provides:

> Not less than 10 Business Days before the
> initial Spread Reset Date, nor less than 85
> Business Days before any other Spread Reset
> Date, each Bank shall advise the Borrower
> (through the Agent) whether such Bank will be
> willing to maintain its portion of the Loan in
> full (or, if applicable, in the lesser amount
> specified by the Borrower in the relevant
> Spread Reset Request) or in part for the
> relevant period commencing on such Spread Reset
> Date.

Section 2.04(g) provides: "If a Bank elects in <u>its sole discretion</u>

not to deliver a Spread Bid to the Borrower, as provided in Section

2.04(f), such Bank shall be deemed to have delivered to the

Borrower a Mandatory Prepayment Election Notice designating the

relevant Spread Reset Date as a Mandatory Prepayment Date with

respect to the Loan." (emphasis added).

The Agreement defines the relevant terms used in these

sections.   Per section 1.01, a "Spread Reset Date" is "each day

that is that last day of an Interest Period."   Per section 2.07,

the first "Interest Period" is the first month of the loan, the

second is the following 11 months, and the following interest

periods each have a duration of twelve months.   Thus, not only does

HVB have the sole discretion to demand prepayment on the loan

during any Spread Reset Date, but mere inaction by the Bank --

failure to deliver a Spread Bid -- triggers mandatory prepayment by

the borrower.

Sussex argues that facial ambiguity is suggested by the

agreement's "Expiry Date" of December 4, 2030, <u>id.</u> § 1.01, as well

as the use of the term "shall" in section 2.04(a) ("The Spread on

the Loan shall be reset on each Spread Reset Date for each Interest

Period ending on the next succeeding Spread Reset Date").   Opp'n to

1   MSJ at 5.  These terms do not create a facial ambiguity.  The

2   Credit Agreement contemplated a loan that could last <u>as long as</u>

3   thirty years.  When read in context, the expiry date merely

4   provides the outer temporal limit for the parties' obligations

5   under the loan.  The use of "shall" in section 2.04(a) alone does

6   not rise to the level of facial ambiguity, given the clear language

7   and proximity of sections 2.04(d) and (g), which give the bank sole

8   discretion on whether to deliver a Bid Spread or a Mandatory

9   Prepayment Notice to the borrower on each Spread Reset Date.  For

10  these reasons, the Credit Agreement contains no facial ambiguity as

11  to HVB's right to not renew the loans after one year.[7]

12      Moving to step one of California's parol evidence rule, the

13  Court provisionally admits the evidence that Sussex argues supports

14  an alternative reasonable interpretation of an ambiguity.  Sussex

15  argues that the language in the Credit Agreement "is not so clear

16  and explicit with respect to HVB's right to refuse renewal for any

17  arbitrary reason," and argues that the language should be

18  "interpreted in the 'ordinary and popular sense' consistent with

19  the customs in this trade."  Opp'n to MSJ at 6.

20      Sussex provides evidence it argues supports several

21  alternative interpretations of the language.  First, Sussex argues

22  that HVB was required to renew the loans each year, "subject to

23  commercial reasons."  <u>Id.</u> at 6-7.  In support of this

24  _____

25  [7] If either party had sought to enforce the Credit Agreement's
    choice-of-law provision requiring interpretation in accordance with

26  New York law, Credit Agreement § 10.09, the parol evidence analysis
    would end here, with the extrinsic evidence barred.  Under New

27  York's parol evidence rule, extrinsic evidence is barred if the
    agreement's meaning is complete, clear, and unambiguous on the face

28  of the writing within its four corners.  <u>W.W.W. Associates, Inc. v.</u>
    <u>Giancontieri</u>, 77 N.Y.2d 157, 161-63 (1990).

**United States District Court**
For the Northern District of California

interpretation, it cites to an e-mail sent by DeGiorgio to Hahn during the CARDS negotiations, in which it quotes DeGiorgio as acknowledging the term of the loans as "30 years with annual rate reset provisions. . ." Opp'n to MSJ at 6. It also attaches an affidavit by Groves, who identifies himself as a former employee of myCFO, Inc. ("myCFO"). Groves Aff. ¶ 1. Groves claims that myCFO was hired by clients to advise on the benefits and risks of CARDS, that myCFO employees "negotiated with Dom Degiorgio and others regarding the terms of the loan agreement," and that myCFO "was assured [HVB] would renew the loans unless there was a valid business reason for not doing so." Id. ¶¶ 1, 3, 7. Groves claims: "Examples used by Mr. Degiorgio of a valid reason would be the deterioration of a client's credit worthiness or insufficient collateral to support the loan." Id. ¶ 7.

The second interpretation Sussex advances is one in which HVB had an absolute obligation to offer a reset interest rate. Opp'n to MSJ at 6-7. To support this interpretation, it cites deposition testimony from DeGiorgio which it argues demonstrates that DeGiorgio believed HVB was obligated to offer a reset interest rate. Id. Sussex also attaches, but does not cite to, a declaration by Hahn, in which Hahn describes the Sussex/HVB negotiations and alleges that he made it clear to HVB that its intent to renew the loan for thirty years was critical, because it "would enable the borrower to satisfy the business purpose requirement necessary to obtain the tax benefits of the CARDS transaction." Hahn Decl. I ¶¶ 5, 9-14. Nothing in Hahn's Declaration suggests that this obligation was subject to "commercial reasons."

1    Finally, Sussex cites to deposition testimony from DeGiorgio

2  which it claims suggest DeGiorgio believed the borrower, not the

3  lender, had sole discretion as to whether to accept a reset offer.

4  Opp'n to MSJ at 6-7.

5    The Court notes two distinct problems with the evidence

6  proffered by Sussex.  The first is that Sussex's only piece of

7  evidence that predates the Agreement -- and thus not subject to the

8  taint of litigation -- is quoted woefully out of context.  Sussex

9  quotes the DeGiorgio/Hahn E-mail with DeGiorgio acknowledging the

10  term of the loans as "30 years with annual rate reset provisions

11  . . . "  Opp'n to MSJ at 6.  The Court finds Sussex's use of

12  ellipses here to be extremely misleading.  The full portion of

13  DeGiorgio's term states: "term of loan - 30 years with annual rate

14  reset provisions, <u>possibly resulting in a prepayment of the entire</u>

15  <u>facility after 12 months or at any 12 month anniversary</u>

16  <u>thereafter</u>."  DeGiorgio/Hahn E-mail (emphasis added).  This e-mail

17  does not suggest an ambiguity.  Rather, it supports the

18  construction clear from the face of the Credit Agreement.  The

19  agreement could last as long as thirty years, but the loan could be

20  called by HVB on the second Spread Reset Date, or on any following

21  Spread Reset Date.  The extrinsic evidence proffered by Sussex

22  suggests that HVB bargained for -- and ultimately received -- the

23  right to call the loan every twelve months.  Futhermore, nothing in

24  this e-mail suggests the specific interpretation Sussex advances --

25  that HVB was required to renew the loans each year "subject to

26  commercial reasons."

27    The second issue is that the parol evidence proffered does not

28  render the Credit Agreement reasonably susceptible to a particular

1    alternative interpretation.  To be admissible under California's

2    parol evidence rule, this evidence must produce more than just an

3    ambiguity; it must reveal an alternative meaning to which the

4    contract's language is reasonably susceptible.  Dore v. Arnold

5    Worldwide, Inc., 39 Cal. 4th 384, 391 (2006).  Here, Sussex's

6    evidence does not suggest the language is reasonably susceptible to

7    a particular meaning.  Rather, it suggests several conflicting

8    interpretations: that HVB's power to unwind the loans was subject

9    to "commercial reasons;" that HVB had an absolute obligation to

10   reset the interest rate; that borrower rather than lender had sole

11   discretion to unwind the loans.  Sussex has not attempted to show

12   the Credit Agreement is susceptible to a specific alternative

13   reading -- it has merely attempted to show ambiguity.  The most

14   plausible of the three interpretations -- that HVB was required to

15   renew the loans subject to "commercial reasons" -- is only

16   supported by the Groves Affidavit, and is contradicted by the

17   portion of DeGiorgio's deposition testimony that Plaintiff cites.

18       The Court finds that in light of this evidence, the Credit

19   Agreement is not reasonably susceptible of any reading other than

20   the one clear from the plain text of the agreement, giving HVB sole

21   discretion to call the loan after a year.  As such, this evidence

22   is at variance with the Credit Agreement and is barred by the parol

23   evidence rule.

24       Sussex argues that even if its extrinsic evidence is barred,

25   the Credit Agreement should be interpreted to avoid an "absurdity."

26   Opp'n to MSJ at 5.  Sussex does not explicitly state what that

27   absurdity is.  The Court assumes it is the "2800%+ return during

28   the first year of the loan" that Sussex alleges and attempts to

United States District Court
For the Northern District of California

1   prove HVB received in its MPSJ.  See MPSJ at 9, Brady Decl. I Ex. A

2   ("HVB Internal Documents") at HVB_Sussex041263, 041242-041244.

3       The Court's interpretation of the Credit Agreement might be

4   absurd if it allowed HVB to acquire a 2800 percent return while at

5   the same time frustrating all the benefits due to the clients, but

6   it does not do this.  While Sussex claims that HVB's mandatory

7   prepayment notice frustrated its clients' ability to receive the

8   intended tax benefits of the transaction, SAC ¶ 14, the Credit

9   Agreement permitted clients to sell their deposit in the first

10  year, and in doing so, claim an immediate tax loss.  Hahn Dep. I at

11  276:12-277:21, 350:22-356:4.  The evidence shows that clients did

12  this -- Hahn admitted that he and his wife entered into a CARDS

13  agreement as a client in 2000, and that he took a CARDS-related tax

14  deduction in that same year.  Id.  While writing off such an amount

15  might raise red flags with the IRS, it is clear from the evidence

16  presented that all parties realized that such an immediate write-

17  off was not only a possibility, but arguably the purpose of the

18  transaction.  Thus, HVB stood to make substantial profits on these

19  "zero-risk" loans, see DeGiorgio/Hahn E-mail, but the client could

20  also receive a sizable tax benefit -- albeit one that all realized

21  was of questionable legality -- within that first year.  The

22  results of the Court's construction of the Credit Agreement are not

23  absurd.

24      Finally, Sussex cites City of Hope National Medical Center v.

25  Genentech, Inc., 43 Cal. 4th 375, 397-398 (2008), for the

26  proposition that "[w]here uncertainty continues to exist, the

27  language must be interpreted against the party responsible for that

28  uncertainty."  Opp'n to MSJ at 6.  However, HVB did not draft the

**United States District Court**
For the Northern District of California

Credit Agreement.  Hahn admitted that the agreements were provided
by Sussex and were substantially similar to agreements Sussex had
used earlier with other lenders.  Hahn Dep. I at 45:11-51:23.  As
such, Sussex, not HVB, is responsible for any uncertainty, and so
the Credit Agreement should be interpreted against Sussex, not HVB.

HVB argues that because the Credit Agreement unambiguously
provided HVB with the right to not renew the loans at the first
Spread Reset Date, any reliance by Sussex on statements to the
contrary is unjustified and unreasonable.  MSJ at 12.  Sussex
argues that whether reliance was reasonable is a question of fact
not proper for summary judgment.  Opp'n to MSJ at 4.  While
reasonable reliance is generally a question of fact, a party may
not, as a matter of law, justifiably rely on a representation that
is patently at odds with the express provisions of a written
contract.  Hadland v. NN Investors Life Ins. Co., 24 Cal. App. 4th
1578, 1586 (Ct. App. 1994).  The Court thus finds that Sussex has
failed to provide any evidence to support a finding of
misrepresentation and reasonable reliance -- two required elements
of Sussex's First Fraud Claim -- and thus summary judgment in HVB's
favor is appropriate as to Sussex's First Fraud Claim.

D.    **HVB's Causation Argument**

HVB argues that Sussex has failed to produce evidence of an
injury caused by Sussex's alleged misrepresentations.  To recover
for fraud, a plaintiff must prove injury or damage and prove a
causal connection between the defendant's alleged tortious conduct
and the plaintiff's resulting injury.  Goehring v. Chapman Univ.,
121 Cal. App. 4th 353, 354 (Ct. App. 2004).  Even if a plaintiff
has justifiably relied on a misrepresentation, "no liability

**United States District Court**
For the Northern District of California

1  attaches if the damages sustained were otherwise inevitable or due

2  to unrelated causes." <u>Kruse v. Bank of America</u>, 202 Cal. App. 3d

3  38, 60 (Ct. App. 1988).

4      Likewise, "RICO requires as a threshold for standing an injury

5  to business or property." <u>Avalos</u>, 596 F.3d at 592.  This injury is

6  determined by reference to state law, including injuries from

7  state-law claims such as fraud, intentional interference with

8  contract, and interference with prospective business relations.

9  <u>Diaz v. Gates</u>, 420 F.3d 897, 900-01 (9th Cir. 2005).  Sussex

10  alleges no injuries under RICO other than the two that underlie its

11  fraud claims.  Thus, if Sussex has failed to allege a valid injury

12  for its fraud claims, it has failed to allege one for its RICO

13  cause of action, and all three claims should fail.

14      Even if the plaintiff can allege a corresponding state-law

15  injury, the Ninth Circuit requires the consideration of three

16  factors in determining whether a plaintiff has standing to bring a

17  RICO action:

18          (1) whether there are more direct victims of
            the alleged wrongful conduct who can be counted
19          on to vindicate the law as private attorneys
            general; (2) whether it will be difficult to
20          ascertain the amount of the plaintiff's damages
            attributable to defendant's wrongful conduct;
21          and (3) whether the courts will have to adopt
            complicated rules apportioning damages to
22          obviate the risk of multiple recoveries.

23  <u>Mendoza v. Zirkle Fruit Co.</u>, 301 F.3d 1163, 1169 (9th Cir. 2002).

24      Sussex alleges two distinct injuries.  First, it claims that

25  it paid HVB more than $4 million in loan origination fees that it

26  would not have paid if it had known HVB intended to require

27  mandatory prepayment of the loans after one year.  SAC ¶ 28.

28  Second, it claims HVB's misrepresentations caused Sussex's clients

United States District Court
For the Northern District of California

1    to sue Sussex, requiring Sussex to spend $330,451 defending itself.

2    Id. ¶ 29.  These are the only damages identified by Sussex for its

3    fraud causes of action and its RICO claim.

4                1.    Sussex's Loan Origination Fees

5         HVB argues that the loan origination fees Sussex seeks are not

6    a proper injury caused by HVB's conduct.  MSJ at 18-19.  HVB claims

7    that Sussex was made better off -- not worse off -- through HVB's

8    participation in CARDS, noting that Sussex earned approximately

9    $14,795,000 in client fees from the CARDS transactions in which HVB

10   was the lender.  Id.; Rossi Decl. I Ex. C ("Pl.'s CARDS Fees").

11   HVB argues that the loan origination fees were "wholly derived from

12   Sussex's clients."  MSJ at 19.

13        Sussex counters by arguing that the fees received from its

14   clients are irrelevant, comparing its predicament to that of "a

15   general contractor who is paid to build a house."  Opp'n to MSJ at

16   8 n.4.  The general contractor, argues Sussex, is "free to hire

17   whoever he wants and pay them accordingly with no input from the

18   client."  Id.  If a supplier delivers an inferior product, the

19   general contractor can "sue the supplier for fraud if he knowingly

20   promised one product but delivered another . . . . even if the

21   client didn't complain."  Id.

22        Sussex's analogy is flawed.  If a plaintiff contracts in

23   reliance on the fraud of a defendant, the plaintiff may elect

24   either the contract remedy (restitution based on rescission) or the

25   tort remedy (affirmance and damages), but not both.  Hjorth v.

26   Bernstein, 44 Cal. App. 2d 561, 564, (Ct. App. 1941).  The

27   hypothetical general contractor above could seek to rescind the

28   contract, but would have to return any consideration received.

**United States District Court**
For the Northern District of California

1  <u>Imperial Cas. & Indem. Co. v. Sogomonian</u>, 198 Cal. 3d 169, 182,

2  (1988).

3      Sussex does not seek rescission, however, and so it is limited

4  to damages in tort.  A cause of action in fraud would exist in the

5  hypothetical above only if the general contractor was injured --

6  for example, if the contractor had to purchase a second batch of

7  the product from another supplier to replace the inferior product,

8  or if the contractor had to reimburse his client for damages

9  resulting from use of the inferior product.  Sussex does not claim

10 that it assisted its clients in finding a bank to replace HVB, thus

11 incurring an additional expense.  Nor does it claim that it

12 refunded these fees to its clients, or that HVB's misrepresentation

13 led to a decrease in goodwill for Plaintiff among its clients.

14 Sussex merely states: "Had Plaintiff known of HVB's intent to

15 unwind these loans at the first anniversary, HVB would not have

16 been used as the lender in these loans."  Opp'n to MSJ at 8.  This

17 is not an injury.  Because the payment of fees is not an injury in

18 itself, Sussex's payment of loan origination fees does not

19 constitute an injury for its fraud and RICO claims.

20      Sussex argues that HVB "should not be allowed to retain its

21 ill gotten gains," Opp'n to MSJ at 8, and argues that a

22 disgorgement remedy is appropriate under <u>Ward v. Taggart</u>, 51 Cal.

23 2d 736 (1959).  Sussex offers a summary of Ward:

24          [P]laintiff asked his real estate broker,
           Thomsen, to search for properties for purchase.
25          Defendant Taggert told Thomsen that as the
           exclusive agent for Sunset Oil Company, he had
26          several acres available for sale.  Thomsen
           submitted plaintiff's offer of $4,000 per acre
27          to Taggart.  Taggert told Thomsen that Sunset
           would not take less than $5,000 per acre. The
28          offer was made, and the deal closed.  Taggert

                                  31

1
submitted his own offer of $4,000 per acre to Sunset then re-sold the land to plaintiff at $5,000 pocketing the $72,049.20 differential.
2
Judgment was entered against Taggart for this compensatory damage, and $36,000 punitive
3
damages.

4

5     Opp'n to MSJ at 9.

6         Sussex's summary of <u>Ward</u> is correct, but unhelpful.  <u>Ward</u>

7     involved a defendant with a statutory fiduciary duty to the

8     plaintiff, as provided by Section 10150 of California's Business

9     and Professions Code.  "In the absence of a fiduciary relationship,

10    recovery in a tort action for fraud is limited to the actual

11    damages suffered by the plaintiff." <u>Ward</u>, 51 Cal. 2d at 741.  In

12    California, an ordinary arms-length transaction between a bank and

13    borrower does not give rise to a fiduciary duty.  <u>Mitsui Mfrs. Bank</u>

14    <u>v. Super. Ct.</u>, 212 Cal. App. 3d 726, 729 (Ct. App. 1989).

15    Furthermore, Sussex was not even a party to the Credit Agreements,

16    but rather was the agent representing the LLCs and Sussex's

17    clients.  As such, a disgorgement remedy is inappropriate here.[8]

18    For the above reasons, Sussex has failed to show it can recover

19    loan origination fees paid to HVB as damages for its fraud claims

20    and its RICO claims.

21              2.   <u>Sussex's Legal Costs</u>

22        Sussex claims HVB's conduct caused Sussex to incur legal costs

23    in defending itself in actions brought by its CARDS clients.  SAC ¶

24    29.  The Court notes that this is not an action in contribution,

25    ────────────────────
[8] Sussex also cites California Civil Code Section 2224 as support
26    for its disgorgement argument.  MPSJ at 21-22.  Section 2224
      states: "One who gains a thing by fraud . . . is . . . an
27    involuntary trustee of the thing gained," but this statute only
      applies to transactions involving some interest in property.  <u>Kraus</u>
28    <u>v. Willow Park Pub. Golf Course</u>, 73 Cal. App. 3d 354 (Ct. App.
      1977).  Thus it is not applicable here.

**United States District Court**
For the Northern District of California

1    subrogation, or indemnity -- Sussex claims that as a consequence of

2    HVB's misrepresentation of its lack of intent to renew the loans

3    for thirty years and its alleged failure to properly "fund" the

4    loans, Sussex was sued by its clients.  Id.  HVB argues that its

5    alleged misrepresentations are not a cause of Sussex's current

6    legal trouble.  MSJ at 15-18.  HVB argues that a far more direct

7    cause of the lawsuits was Sussex's failure to notify its clients

8    that the author of the "favorable tax opinion" used to validate

9    CARDS was receiving payments from Sussex for each CARDS

10   transaction, and suggests that Sussex committed fraud against its

11   clients by failing to disclose these payments.  Id.

12        Sussex did not respond to HVB's causation arguments in its

13   Opposition.  See Opp'n to MSJ.  However, Sussex's theories of

14   causation can be gleamed from statements made in other filings

15   before the Court.  One theory suggested, but not explicitly stated,

16   is that HVB's conduct brought CARDS to the attention of the IRS.

17   This theory is suggested by Sussex's expert, Boak, who writes in

18   her expert report: "It has also been my experience that the IRS

19   chooses its litigation vehicles carefully, preferring to wait for a

20   case with 'egregious facts' than to risk a precedent-setting loss

21   in court."  Rossi Decl. II Ex. T ("Boak Expert Report") at 5.  By

22   not renewing the CARDS loans, Boak alleges HVB made "the 30-year

23   term of the transaction appear to be bogus."  Id. at 6 (emphasis

24   added).

25        To the extent that Sussex is arguing that its harms were

26   caused by HVB "ringing the alarm" on CARDS by bringing an unlawful

27   tax shelter to the attention of the IRS, this argument must fail as

28   a matter of law.  If HVB's actions merely contributed to the

**United States District Court**
For the Northern District of California

appearance of fraud, but CARDS was fraudulent as designed, Sussex's claims would be barred by the doctrine of *in pari delicto*.  <u>Bateman Eichler, Hill Richards, Inc. v. Berner</u>, 472 U.S. 299, 310-11 (1985) (holding, within the securities context, that *in pari delicto* bars recovery "only where (1) as a direct result of his own actions, the plaintiff bears at least substantially equal responsibility for the violations he seeks to redress, and (2) preclusion of suit would not significantly interfere with the effective enforcement of the securities laws and protection of the investing public.")  Sussex does not deny that it is responsible for the design and marketing of CARDS; the record is clear that the CARDS strategy was fully formed before HVB agreed to serve as a CARDS lender.  If CARDS was fraudulent as designed, both HVB and Sussex would bear substantially equal responsibility, and relief for Sussex would be barred by law.

Sussex's other theory suggested in Boak's Expert Report is that CARDS was not fraudulent as designed, but that HVB's failure to renew the loans caused CARDS to be fraudulent, which led the IRS to identify CARDS as a "listed transaction," which in turn led to tax liabilities for the CARDS clients, which in turn led to the lawsuits filed by the CARDS clients against Sussex.  <u>See</u> Boak Expert Report at 2 ("the CARDS transaction was legitimate, except that . . . the failure by HVB to properly execute the transaction as envisioned by its promoters doomed it from the outset").  This theory of causation requires HVB's conduct to be one of the reasons for the IRS's decision to list CARDS.

HVB points out that in the IRS's 2002 notice in which the agency listed CARDS, and in a subsequent "Coordinated Issue Paper"

issued by the IRS on October 15, 2004, the term of the loan was not given as a reason for listing the transaction. See MSJ at 16, IRS Notice 2002-21, IRS Issue Paper. The IRS Issue Paper provided several reasons for its conclusion, including that the client's loss was not bona fide, that the loan to the LLC did not constitute genuine indebtness, and "the transaction as a whole lacks economic substance and business purpose apart from tax savings." IRS Issue Paper at 2.

The Court finds that Sussex has provided no evidence to support the argument that CARDS's listing was due to HVB's actions rather than the basic design of CARDS. The Court finds each of the given reasons for the IRS's action to be evident from the basic design of CARDS. That the loss is not bona fide is clear from the fact that the client could claim a tax loss far exceeding his actual position in the loan, in part by "borrowing" the foreign LLC's tax-free status. DeGiorgio Dep. at 223:5-224:18, Boak Dep. at 77:3-14. Lack of "genuine indebtedness" is evident in the fact that the LLC was required to pledge back the entirety of the loan proceeds to the bank, effectively creating a "zero-risk" loan for the lenders. Boak Dep. at 77:12-14, 77:24-78:19; DeGiorgio/Hahn E-mail.

Sussex admits that, over the short term, the loan costs and negative carry effectively remove any legitimate business purpose from the loan, leaving tax avoidance as the sole purpose for a client to participate in CARDS. Opp'n to MSJ at 2. Sussex argues that this is why HVB's thirty-year commitment was so important: CARDS only has the semblance of a legitimate business purpose if it lasts for thirty years, because only deep into the life of the loan

**United States District Court**
For the Northern District of California

will the client's costs be amortized.  <u>Id.</u>  But CARDS's structure
gave both the bank and the borrower the right to call the loan once
per year.  <u>See</u> CARDS Presentation at SUS_HVB034435, Credit
Agreement § 2.04(g).  Furthermore, the lender had an unfettered
right to transfer the loan to another bank.  Credit Agreement
§ 2.06.  Because the parties' ability to wind up the loan earlier
than thirty years was hard-wired into CARDS, HVB's lack of intent
to renew after a year cannot be a cause of CARDS's listed-
transaction status.

Similarly, the conduct underlying Sussex's Second Fraud Claim
-- HVB's alleged failure to properly fund the loans in individual
accounts -- has no causal bearing on the IRS's subsequent
determinations.  Nowhere in IRS Notice 2002-21 or its Coordinated
Issue Paper does the IRS suggest its reasoning was based in part on
lenders' failure to follow protocol.  Sussex provides no theory
linking this alleged "failure to fund" with either injury.

Boak's expert testimony alone does not create a dispute of
material fact here, because to the extent Boak alleges HVB "doomed"
CARDS, she fails to comply with Rule 56(e) of the Federal Rules of
Evidence.  Boak does not "set forth specific facts showing that
there is a genuine issue for trial."  <u>See</u> <u>U.S. v. Various Slot</u>
<u>Machines on Guam</u>, 658 F.2d 697, 701 (9th Cir. 1981).  Boak merely
presents a conclusion -- that HVB's conduct alone doomed CARDS --
without a coherent statement on how she arrived at that conclusion.

The Court's conclusion here is consistent with a recent
opinion by the U.S. Tax Court on the validity of tax losses
generated through CARDS.  <u>Country Pine Fin., LLC v. Comm'r of</u>
<u>Internal Revenue</u>, T.C. Memo, 2009-251, No. 1399-07, 2009 WL 3678793

**United States District Court**
For the Northern District of California

(Nov. 5, 2009).  In Country Pine Finance, the U.S. Tax Court disallowed losses in a CARDS transaction funded by another bank because the CARDS transaction "lacked economic substance."  Id. at *16.  In the opinion of the court, the transaction lacked economic substance because it "consisted of prearranged steps entered into to generate a tax loss; the loan proceeds were never at risk and the transaction giving rise to the tax loss was cashflow negative."  Id. at *12.  Such is true with every CARDS transaction, and evident from the agreements governing the transaction.  Regardless of the parties' intent, the agreements forming a CARDS transaction -- particularly, the Credit Agreement negotiated by Sussex and HVB -- produce a transaction where there is no genuine indebtedness and in which the client has the opportunity to claim an inflated tax loss.

It follows then that CARDS's listing by the IRS -- the event that triggered Sussex's clients' lawsuits -- was caused not by any actions of HVB carrying out the loan, but rather by the design of CARDS itself.  Thus there exists no possible line of causation linking HVB's alleged misrepresentations and Sussex's attorney fees.

Because both of Sussex's would-be injuries are not caused by HVB's alleged wrongdoing, Sussex's two fraud claims must fail.  Because these injuries also provide the basis for Sussex's RICO claim, the RICO claim as well must fail.  The Court thus need not determine if the Mendoza factors favor Sussex's RICO standing.

///

///

///

///

**V.    CONCLUSION**

The Court finds that because Plaintiff Sussex Financial Enterprises, Inc. has failed to produce any admissible evidence establishing the misrepresentation and justifiable reliance elements of Plaintiff's First Fraud Claim, this claim must fail. The Court also finds that because Plaintiff has failed to provide evidence that the conduct of Defendants Bayerische Hypo-Und Vereinsbank AB, HVB Risk Management Products, Inc., and HVB U.S. Finance, Inc. was a legal cause of its alleged injuries, Plaintiff's First and Second Fraud Claims and its RICO Claim must fail.  Accordingly, the Court GRANTS the Motion for Summary Judgment filed by Defendants and DENIES the Motion for Partial Summary Judgment by Plaintiff.

IT IS SO ORDERED.

Dated: July 20, 2010

UNITED STATES DISTRICT JUDGE